Bernard Worthy was indicted and convicted for the unlawful possession of cocaine. He was sentenced as a habitual offender to fifteen years' imprisonment. On appeal, Worthy's single argument is that his motions to quash the indictment and to suppress the cocaine should have been granted because there was no legal justification for the initial stop. We reject this contention.
At approximately 9:15 on the night of December 25, 1983, Montgomery Police Officer Terry Jett and his partner were in the neighborhood of the Bell Street Grocery investigating the report of a car that was being driven recklessly. After stopping one vehicle, he "observed a car across at the Bell Street Grocery parked on the side of the building with its lights on."
He drove his patrol car across the street to investigate "why the car was parked across the street." Officer Jett testified that he initially approached the car because "[i]t was sitting on the side of a business, Bell Street Grocery, which was closed and which was known to me to have acts of burglary and vandalism." When he got out of his car he saw the person who had been sitting in the driver's side of the vehicle move to the passenger's side. As Officer Jett got closer, he noticed that the vehicle's engine was running.
As Jett and his partner approached the car, "a black man ran from the Bell Street side to — from the Riverside area, and we stopped to see what he was going to do before we approached the car any further." The black man asked the officers "what was going on" and Jett "said we were seeing what this car was doing over here and who was he." The black man identified himself as Lamar Munfield and said that the man in the car was his brother, Bobby Munfield.
Officer Jett walked to the car and asked the occupant his name. The defendant identified himself as Bernard Worthy. Jett testified:
 "Since I had a conflict in what one gentleman was saying and him, I asked him to get out of the car. Well, I recognized the name Bernard Worthy and I know he had been known to fight with the police, so I asked him to get out of the car for my safety and his safety. * * * To make sure no weapons were within his reach that I could not see."
Officer Jett asked the defendant about the conflict in names and "advised him that it was against the law to conceal your identity." As Jett started to frisk the defendant for weapons, the defendant pushed the officer and "ran around the car and started running down Bell Street."
Officer Jett pursued and apprehended the defendant. After he was handcuffed, the defendant spit from his mouth a pill and a "cellophane package with some white substance in it."
Officer Robert Parker, Officer Jett's partner, testified:
 "As my partner and I approached the car the person sitting behind the driver's wheel moved to the passenger side. At this time, another black subject approached us and identified himself as Lamar Munfield. My partner asked Lamar Munfield who the person was that was sitting inside the car and Lamar Munfield said it was Bobby Munfield, my brother."
. . . .
 "My partner, Officer Jett, asked Lamar Munfield for his driver's license to further identify the individual and Lamar Munfield gave us his driver's license. We then asked the person inside the car to get out and identify himself. The person said that he was Bernard Worthy. My partner advised him that Lamar Munfield said that he was his brother, Bobby Munfield, and that he could be arrested for concealing his identity. At this time, Bernard Worthy pushed my partner aside and began running. And my partner pursued him at this time." *Page 636 
Officer Parker testified that, although he observed no criminal activity actually being committed, the circumstances were suspicious:
 "The running car, the individual inside the car, the business, high crime area, we suspected things and we try to check all of them out when we can on patrol. That was our purpose for patrolling out there is to check these businesses."
. . . .
 "Because of the area we were in and the high crime area that we were in, I suspected that there may be something wrong here and we wanted to check it out."
The Fourth Amendment comes into play only if the police have made a "seizure". "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." I.N.S. v. Delgado,466 U.S. 210, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (emphasis added). Not every encounter between an individual and a police officer is a seizure. Florida v. Royer, 460 U.S. 491, 497,103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); United States v.Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877,64 L.Ed.2d 497 (1980); United States v. Martinez-Fuerte, 428 U.S. 543, 556,96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976).
In this case, Officer Jett's initial encounter with the defendant constitutes a seizure sufficient to invoke the application of the Fourth Amendment. There was no "stop" in this case because the defendant was sitting in a parked car when approached by the two officers. The "seizure" occurred when Officer Jett ordered the defendant out of the car. Generally, a seizure occurs when a police officer approaches a parked vehicle and directs the occupant to get out and identify himself. W. LaFave, 3 Search And Seizure § 9.2, n. 105.1, p. 30, 1985 Pocket Part. Compare Atchley v. State, 393 So.2d 1034, 1044 (Ala.Cr.App. 1981), where this Court held that there was no stop or seizure where officers approached the accused as he slept in a parked car, requested identification and questioned him about his activities where the accused chose to comply with the officers and got out of his car without being compelled to do so. Atchley
contains a thorough discussion of the law of the investigatory stop. We must now focus on whether Officer Jett's intrusion upon and interference with the defendant was reasonable since "[t]he touchstone of our analysis under the Fourth Amendment is always `the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' Terry v.Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889
(1968)." Pennsylvania v. Mimms, 434 U.S. 106, 108-109,98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977). Our analysis involves two aspects: the initial confrontation and the subsequent frisk for weapons.
 I
This case involves the stop and frisk procedure. In Terry, it was held that
 "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30, 88 S.Ct. at 1884-85.
In order to justify the brief investigatory detention of an individual, a police officer does not have to have probable cause to arrest the person for a crime. Terry, 392 U.S. at 27,88 S.Ct. at 1883; Spradley v. State, 414 So.2d 170, 173 (Ala.Cr.App. 1982). Although there is "no simple *Page 637 
shorthand verbal formula which can adequately express the grounds for a Terry stop", 3 LaFave at § 9.3, p. 40, 1985 Pocket Part, "the essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v.Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621
(1981).
 "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."
. . .
 "The process [of assessing all the circumstances to determine whether there is sufficient cause to authorize the police to stop a person] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact-finders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Cortez, 449 U.S. at 417-418, 101 S.Ct. at 694-695
(citations omitted).
Although "[p]resence on public streets at a late hour . . . does not of itself constitute cause for detention," State v.Evans, 16 Or. App. 189, 517 P.2d 1225, 1229 (1974), and "simply being about in a high-crime area should not of itself ever be viewed as a sufficient basis to make an investigative stop," 3 LaFave at § 9.3, pp. 80-81, they are factors to be considered in assessing the totality of the circumstances.
 "Especially during the hours of darkness, the police will have a sufficient basis to stop in order to investigate whether a burglary of a closed commercial establishment is pending or had occurred when the suspect is seen in such close proximity to that establishment that he appears to be something other than a mere passerby. Sometimes the time of day and nature of the area will be very significant in establishing the requisite proximity. . . .
 "Another rather common situation is that in which police suspicions are based in whole or in part upon the reactions of the suspect in response to the appearance of police in the vicinity." 3 LaFave at § 9.3, pp. 72-73.
The totality of the circumstances in this case furnishes "a particularized and objective basis" for suspecting the defendant of criminal activity. Cortez, 449 U.S. at 417, 101 S.Ct. at 695. The initial seizure was reasonable and not in violation of the Fourth Amendment.
In United States v. Beck, 602 F.2d 726, 729 (5th Cir. 1979), it was noted that "[t]here is nothing inherently suspicious about two black men sitting in a parked car, with or without the engine running, on a street in a black neighborhood on a midsummer afternoon." That case is factually distinguishable from the one under review. Here, the defendant was observed sitting in a parked car with the lights on and the engine running. The location of the car was important. It was parked next to a grocery store around which "vandalisms and break-ins" had occurred and which, Officer Jett testified, "was closed and which was known to me to have acts of burglary and vandalism."
We further hold that Officer Jett was justified in ordering the defendant to get out of the car.
 "`Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' . . . And we have specifically recognized the inordinate risk *Page 638 
confronting an officer as he approaches a person seated in an automobile."
. . . .
 "Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as de minimis. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a `serious intrusion upon the sanctity of the person,' but it hardly rises to the level of a `"petty indignity."' Terry v. Ohio, supra, 392 U.S. at 17, 88 S.Ct. at 1877. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." Mimms, 434 U.S. at 110-11, 98 S.Ct. at 333.
 II
We also hold that the pat down or frisk of the defendant was reasonable.
"[N]ot all stops call for a frisk." 3 LaFave § 9.4, p. 115. A police officer may conduct a reasonable search of a person for weapons "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27, 88 S.Ct. at 1883.
In determining whether a frisk is justified, two factors must be considered:
 "In determining whether a police officer had a basis for initiating a frisk, there are two matters to be considered. One concerns whether the officer had a sufficient degree of suspicion that the party frisked was armed and dangerous, and the other whether the officer was rightfully in the presence of the party frisked so as to be endangered if that person was armed." 3 LaFave at § 9.4 (a), p. 109.
In part I of this opinion, we held that Officer Jett was rightfully in the defendant's presence.
Once the defendant identified himself as Bernard Worthy, Officer Jett recognized the name of an individual who "had been known to fight with the police." This knowledge provided the officer with a sufficient degree of suspicion that the defendant may have been armed and dangerous. Only after Officer Jett perceived a potential threat was the defendant frisked.
The defendant's only witness, Lamar Munfield, testified that he "lied" and told the officers that the defendant was his brother because "Mr. Worthy had, you know, been involved in a hassle and I knew that he was going to hassle. * * * [I]f you've got a record and they know that they hassle you."
Under these circumstances, the officer's frisk was justified. See Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469,77 L.Ed.2d 1201 (1983).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur. *Page 639